## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**JANE FELIX** and **B.N. COONE,**
    Plaintiffs,

vs.                                                                 No. 1:12-cv-00125-JAP/RHS

**CITY OF BLOOMFIELD,**
    Defendant.

## MEMORANDUM OPINION AND ORDER

In this case, the Court is tasked with deciding whether a monument, inscribed with a version of the Ten Commandments and standing on the lawn in front of the City of Bloomfield, New Mexico municipal building complex, violates Amendment I of the Constitution of the United States of America. This is a difficult endeavor. As United States Supreme Court Justice Clarence Thomas observed, the Supreme Court's Establishment Clause "jurisprudence has confounded the lower courts and rendered the constitutionality of displays of religious imagery on government property anyone's guess. . . ." *Utah Highway Patrol Ass'n v. Am. Atheists, Inc.*, 132 S. Ct. 12, 13 (2011) (Thomas, J., dissenting from the denial of cert.) **Amen**! This is, indeed, one of the "difficult borderline cases" referenced by United States Supreme Court Justice Stephen G. Breyer in his concurring (and controlling) opinion in *Van Orden v. Perry,* 545 U.S. 677, 700 (2005) (Breyer, J., concurring in the judgment). A tweak of the facts (or of the reviewing jurist's nose) could result in a different conclusion. Nonetheless, the Court will do its best, based on the facts it has found and honoring the precedent of higher courts it is bound to follow, to reach the correct result.

## I.       Procedural Background

On April 15, 2013, Plaintiffs Jane Felix and B.N. Coone, and Defendants, the City of

Bloomfield, Scott Eckstein, Matt Pennington, Curtis Lynch, and Pat Lucero,[1] cross-moved for

summary judgment. *See* PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND

MEMORANDUM IN SUPPORT (Doc. No. 62); DEFENDANTS' MOTION FOR SUMMARY

JUDGMENT (Doc. No. 63) (collectively "Motions for Summary Judgment"). The parties agreed

on this basic chronology: on April 3, 2007, at a special council meeting, Kevin Mauzy, a member

of the Bloomfield City Council, proposed that the City of Bloomfield allow citizens to erect a

Ten Commandments monument on the lawn in front of the City of Bloomfield municipal

building complex, the "City Hall Lawn." The City Council unanimously approved this request.

Shortly thereafter, on July 9, 2007, the Bloomfield City Council adopted a resolution creating a

policy governing the placement of monuments on the city lawn. Almost four years passed

without event, during which City Council membership changed. Then, on June 13, 2011, after

Mr. Mauzy had left the City Council, he once again presented to the Council the issue of putting

a Ten Commandments monument on the City Hall Lawn, and the Council "acknowledged" the

placement of the monument under the forum policy. At this point, Mr. Mauzy proceeded to

construct a five-foot tall granite Ten Commandments monument on the City Hall Lawn,

completing the project by July 4, 2011. Subsequently, on July 25, 2011, the Bloomfield City

Council amended the policy governing the placement of monuments on the City Hall Lawn. All

of these basic facts were undisputed. However, despite this agreement, the parties disputed 76

facts discussed in the briefs on the Motions for Summary Judgment. As a result, the Court

---

[1] The Court has since dismissed the claims against the individual Defendants. *See* MEMORANDUM OPINION
AND ORDER (Doc. No. 108).

declined the requests for summary judgment without addressing the parties' legal arguments. *See* ORDER (Doc. No. 89).

Between March 10, 2014 and March 12, 2014, the Court held a bench trial to resolve the disputed facts. Following the trial, the parties submitted requested findings of fact, *see* PLAINTIFFS' PROPOSED FINDINGS OF FACT (Doc. No. 120) and DEFENDANT'S REQUESTED FINDINGS OF FACT (Doc. No. 121), which the Court considered before issuing its findings of fact on June 5, 2014. *See* FINDINGS OF FACT (Doc. No. 124).[2] Because Establishment Clause analysis is fact-intensive, each finding of fact matters; and the Court will not attempt to restate them here in summary form. Instead, the Court refers the reader to the Court's FINDINGS OF FACT (Doc. No. 124) and the Court's SUPPLEMENTAL FINDINGS OF FACT (Doc. No. 131) as a prelude to this MEMORANDUM OPINION AND ORDER.

## II.     Standing

Federal courts have limited jurisdiction, and they may only adjudicate those "Cases" and "Controversies" that the United States Constitution and Congress have granted them authority to decide. *See* U.S. Const. Art. III; *Morris v. City of Hobart,* 39 F.3d 1105, 1110 (10th Cir. 1994). Constitutional standing involves three essential elements: (1) injury-in-fact, (2) causation, and (3) redressability. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992); *Petrella v. Brownback,* 697 F.3d 1285, 1292-94 (10th Cir. 2012) (setting forth and applying factors). These three requirements "ensure that the parties to any litigation have 'such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination.'" *Petrella*, 697 F.3d at 1293 (quoting *Massachusetts v. E.P.A.*, 549 U.S. 497, 516 (2007)). Each of the three

---

[2] After briefing was complete, the Court reopened the trial record to account for the placement of a new Bill of Rights monument on the Bloomfield City Hall Lawn. *See* SUPPLEMENTAL FINDINGS OF FACT (Doc. No. 131).

elements must be established by the party seeking to invoke federal jurisdiction "before a federal court can review the merits of a case." *Consumer Data Indus. Assoc. v. King*, 678 F.3d 898, 902 (10th Cir. 2012); *see also Petrella*, 697 F.3d at 1292.

To show "injury-in-fact," plaintiffs must demonstrate that they have suffered an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). In the context of an alleged Establishment Clause violation, where plaintiffs assert a non-economic injury, an "injury-in-fact" exists if the plaintiffs are "directly affected by the laws and practices against which their complaint[] [is] directed." *Green v. Haskell County Bd. of Comm'rs*, 568 F.3d 784, 793 (10th Cir. 2009) (quoting *O'Connor v. Washburn Univ.*, 416 F.3d 1216, 1222-23 (10th Cir. 2005)). In other words, spiritual harm caused by plaintiffs' frequent, direct, and unwelcome contact with an offensive government-sponsored religious display is a sufficient basis to confer Article III standing. *Am. Atheists, Inc. v. Davenport*, 637 F.3d 1095, 1113 (10th Cir. 2010) (plaintiffs had standing because they "would have to alter their commutes in order to avoid contact with the [challenged cross-shaped] memorials"); *Green*, 568 F.3d at 793-94 (a plaintiff who came into contact with a Ten Commandments monument on at least a weekly basis when visiting the Haskell County Historical Society satisfied the "injury-in-fact" requirement of standing); *O'Connor*, 416 F.3d at 1223 (plaintiff suffered a constitutionally cognizable injury because he was "required to walk past [an offensive sculpture entitled *Holier Than Thou*] almost every week in order to attend meetings and social events").

Here, the undisputed evidence shows that Plaintiff Felix sees the Ten Commandments monument five to six times a week while driving past City Hall. Likewise, Plaintiff Coone passes in sight of the Ten Commandments monument three to four times a week and observes it

once a month in close proximity when he visits City Hall to pay the water bill for his family

residence. Nonetheless, Defendant argues that Plaintiffs have not suffered the requisite "injury-

in-fact" because, although Plaintiffs object to the message engraved on the monument, they have

read this message only once. DEFENDANT'S POST-TRIAL BRIEF (Doc. No. 125 at 2-3).

Defendant emphasizes that the majority of Plaintiffs' contact with the monument occurs while

driving, when it is impossible to read the actual text of the monument from the roadway.

Defendant correctly paraphrases the law, "[o]bjectors do not have standing to challenge unseen

acts just because they live in the same neighborhood, city, state, or country. Rather, they must

have actually 'observed, read, or heard' the offensive message." *Id.* at 3.

But, this is exactly what has happened in this case: Plaintiffs complain of the visual

impact of regularly seeing the Ten Commandments monument, which Plaintiff Felix has read on

at least one occasion and which Plaintiff Coone takes offense at based on his independent

knowledge of what the Ten Commandments are. None of the cases cited by Defendant support a

finding that this injury is not direct, concrete, and particularized. *See, e.g.*, *Green*, 568 F.3d at

793-94 (focusing on the plaintiff's unwelcome contact with the challenged Ten Commandments

monument, rather than with the text of the monument). Defendant's argument relies entirely on a

hyper-technical distinction between seeing the Ten Commandments monument, knowing what it

is, and being offended by it, in contrast to the act of reading the words engraved on the

monument. There is no principled basis for this distinction. *See Books v. City of Elkhart*, 235

F.3d 292, 300-301 (7th Cir. 2000) ("[B]ecause the plaintiffs are aware of the words written on

the front of the monument, merely walking behind it will not eradicate the injury they allegedly

suffered by passing the Ten Commandments monument.").[3] If, as Defendant argues, repeatedly observing an allegedly offensive monument is not "direct" enough contact in and of itself to confer Article III standing, courts would be placed in the unworkable position of having to decide how carefully a plaintiff must read the offending words on a government-sponsored religious display in order to have standing. Has a plaintiff suffered a concrete injury if that plaintiff comes into weekly contact with a religious display and often glances at its caption without reading any of the other words on the display? Or must this hypothetical plaintiff regularly read every word of the allegedly offensive message to establish an "injury-in-fact?" Defendant does not address these nuances and the Court declines to forge into such uncharted territory.

It is well-settled that a plaintiff has standing to challenge an allegedly offensive religious (or anti-religious) display as long as that plaintiff comes into direct, regular, and unwelcome contact with the display. Plaintiffs have satisfied these requirements. Both Plaintiffs are aware of what the Ten Commandments say and are offended by their frequent observation of the Ten Commandments monument located on the City Hall Lawn. Furthermore, Plaintiffs have noted the specific reasons why they need to use the road passing the Ten Commandments monument: Ms. Felix regularly travels north on this road to Aztec, New Mexico, Farmington, New Mexico, and Durango, Colorado; and Mr. Coone drives by the monument to take his grandson to school and to conduct other errands. Article III does not require Plaintiffs to take circuitous routes

---

[3] Defendant attempts to distinguish *City of Elkhart* by arguing that the plaintiffs in that case "became 'aware of the words written on' a [Ten Commandments monument] from repeatedly viewing the [monument] up close in the past." DEFENDANT'S POST-TRIAL BRIEF (Doc. No. 125 at 3). However, in *City of Elkhart*, the Seventh Circuit Court of Appeals does not indicate how the plaintiffs became aware of the words written on the challenged Ten Commandments monument. The Court certainly never states that the plaintiffs repeatedly read the words of the Ten Commandments monument to which they objected. To the contrary, one of the plaintiffs in that case admitted that he did not look directly at the monument every time he passed near it; and both plaintiffs complained of seeing the monument from a distance while patronizing the public library located across the street. *City of Elkhart*, 235 F.3d at 297. Nonetheless, the Court found that they had standing to challenge the display.

around objects that offend them. *City of Elkhart*, 235 F.3d at 300 (rejecting the argument that

plaintiffs lacked standing to challenge a religious display because they could have altered their

paths to avoid coming into contact with it).

Defendant briefly contends that the Supreme Court has recently rejected the very notion

that an offended observer has standing to challenge a regularly-seen government-sponsored

religious display, thereby overruling (or undercutting) *Green*, *O'Connor*, and *Davenport*,

DEFENDANT'S POST-TRIAL BRIEF (Doc. No. 125 at 5). *Town of Greece v. Galloway*, 134 S.

Ct. 1811 (2014), the case cited by Defendant, does not, however, involve an issue of standing. In

*Galloway*, the Supreme Court reiterated the maxim that personal offense is not the touchstone of

an Establishment Clause violation. Defendant's argument that this pronouncement constituted an

implicit rejection of offense as a viable basis for Establishment Clause harm is specious. It has

long been the rule that "an Establishment Clause violation is not made out any time a person

experiences a sense of affront from the expression of contrary religious views . . . ." *Id.* at 1826;

*see Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 780 (1995) (O'Connor, J.,

concurring) (in evaluating whether the Establishment Clause has been violated, a court does "not

ask whether there is *any* person who could find an endorsement of religion. . . . There is always

someone who, with a particular quantum of knowledge, reasonably might perceive a particular

action as an endorsement of religion. A State has not made religion relevant to standing in the

political community simply because a particular viewer of a display might feel uncomfortable.");

*Weinbaum v. City of Las Cruces*, 541 F.3d 1017, 1031 (10th Cir. 2008) (in deciding whether the

purpose and effect of a government display is improper, "a court must view the conduct through

the eyes of an 'objective observer' . . ."). Yet, "offended observer standing," as Defendant calls

it, has flourished. Clearly, there is no conflict between *Galloway* and the Tenth Circuit's standing analysis in *Green*, *O'Connor*, and *Davenport*.[4]

Defendant conflates the question of standing, which asks whether Plaintiffs have suffered a cognizable injury based on their sincere religious beliefs, with the issue on the merits. These are not equivalent. When assessing whether a plaintiff has suffered an "injury-in-fact," a court does not consider whether the "alleged injury rises to the level of a constitutional violation." *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1088 (10th Cir. 2006). "If that were the test, every losing claim would be dismissed for want of standing," *id.* at 1092, and the standing analysis would usurp consideration of the merits of a plaintiff's constitutional claim.

In summary, the Court agrees with Plaintiffs that their unwelcome encounters with the Ten Commandments monument on the City Hall Lawn satisfy the "injury-in-fact" requirement for standing to bring this lawsuit. As Plaintiffs contend, and Defendants do not appear to dispute, once the injury-in-fact element of standing is established, the other two elements of standing are "easily satisfied." PLAINTIFFS' SUPPLEMENT BRIEF (Doc. No. 127 at 3). The causation prong requires that the injury be "fairly traceable to the challenged action of the defendant." *Lujan*, 504 U.S. at 560; *see also Petrella*, 697 F.3d at 1293. In this case, as Plaintiffs note, the alleged "violation of the Establishment Clause is based on the City's approval and support of the Ten Commandments Monument and its placement on the front lawn of the Bloomfield City Hall." PLAINTIFFS' SUPPLEMENT BRIEF (Doc. No. 127 at 3). Thus, Plaintiffs' injury is

---

[4] Moreover, as Defendant elsewhere admonishes, a district court must exercise extreme caution before "infer[ring] that the Supreme Court implicitly overruled [Tenth Circuit] precedent." DEFENDANT'S POST-TRIAL BRIEF (Doc. No. 125 at 7) (quoting *United States v. Allen*, 895 F.2d 1577, 1579 (10th Cir. 1990)). In the absence of any credible showing that *Green*, *O'Connor*, and *Davenport* have ceased to be good law, the Court is bound to apply the rule concerning offended observer standing as articulated in these cases.

traceable to Defendant and court-ordered removal of the monument would redress Plaintiffs' injury.

### III.      The Public Forum Doctrine

The first substantive issue facing this Court is whether the Establishment Clause provides the proper framework for evaluating Defendant's sponsorship of the Ten Commandments monument, which stands on the Bloomfield City Hall Lawn along with three similar-looking monuments. Defendant maintains that, because all four monuments were erected after the City of Bloomfield adopted a written policy delineating the criteria for placing a privately-funded monument on the City Hall Lawn, these monuments do not speak for the City of Bloomfield. Defendant argues that they instead convey a message on behalf of private parties, whose words remain unfettered by the Establishment Clause. In other words, Defendant contends that it has created a public forum for private speech on the City Hall Lawn.

In Establishment Clause jurisprudence, the distinction between private speech and government speech is crucial. *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 302 (2000). The Establishment Clause forbids "government speech endorsing religion." *Id.* Thus, when the government speaks for itself it must carefully avoid expressing favoritism for a particular religious viewpoint. However, when the government merely sponsors private speech, by providing citizens with equal access to a public forum, such as a public park, Establishment Clause concerns wane. *See Capitol Square Review & Advisory Bd. v. Pinette,* 515 U.S. 753, 763 (1995) (religious expression does not violate the Establishment Clause when it occurs in a designated public forum open to a broad range of speakers on equal terms); *Bd. of Educ. v. Mergens*, 496 U.S. 226, 234-235 (1990) (allowing religious clubs equal access to school property does not violate the Establishment Clause). The legal justification for this common-sense result

is that an individual's contribution to an open forum is not considered government speech.[5] *Santa Fe Indep. Sch. Dist.*, 530 U.S. at 302. Rather, it is private speech protected by the Free Speech and Free Exercise Clauses. *Id.*

Three key qualities characterize an open public forum, *i.e.* a forum in which government-sponsored speech is appropriately considered private speech and is, therefore, not regulated by the Establishment Clause. An open public forum must be (1) accessible to a variety of speakers, (2) on a broad range of topics, (3) regardless of the speakers' messages. *See Pinette*, 515 U.S. at 757-58 (a park opened to the public on equal terms for a broad range of uses, including unattended temporary displays, is a traditional public forum); *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 395 (1993) (a school district created an open forum by permitting private groups to use school facilities during off-hours for a variety of civic, social, and recreational purposes); *Widmar v. Vincent*, 454 U.S. 263, 273 (1981) (a university created a public forum "open to all forms of discourse" by accommodating the meeting of student groups on campus). Of course, not every government-created forum will exhibit these features, and it is possible for the government to violate the Establishment Clause through a selection of speakers for a more limited forum. *See Santa Fe Indep. Sch. Dist.*, 530 U.S. at 309-10 (school violated the Establishment Clause by sponsoring student-led prayer at home football games). The act of allowing "selective access [to government property] does not transform [that] property into a public forum" exempt from Establishment Clause review. *Id.* at 303.

Thus, the question is whether the display of granite monuments on the City Hall Lawn is not government speech because Defendant has created the type of open public forum that sufficiently disassociates the City from the messages conveyed by these monuments. Defendant contends that the answer to this question lies in a careful application of the four-factor test for

---

[5] For lack of a better name, the Court will call this the "public forum doctrine."

identifying private speech, which the Tenth Circuit described in *Wells v. City & County of Denver*, 257 F.3d 1132 (10th Cir. 2001). Defendant overstates the significance of *Wells*. In *Wells*, the Tenth Circuit considered whether a holiday display was governmental or private speech in the context of a Free Speech Clause challenge to governmental restrictions on the content of the display. By its own terms, *Wells* is part of a line of cases involving "the government speech doctrine" – the doctrine that the government "is constitutionally entitled to make 'content-based choices' and to engage in 'viewpoint-based funding decisions'" when it speaks directly or through private intermediaries. *Id.* at 1139. While the government speech doctrine and the factors listed in *Wells* are closely related to the public forum analysis discussed above, they are not equivalent.[6] *See Santa Fe Indep. Sch. Dist.*, 530 U.S. at 303 n. 13 (the Supreme Court has "never held the mere creation of a public forum shields the government entity from scrutiny under the Establishment Clause."). Consequently, *Wells* is not directly applicable or helpful in determining whether a display is government speech for the purposes of the Establishment Clause.[7] Given that there is precedent squarely addressing this question, the Court need not rely on *Wells* to extrapolate. Rather, the Court will follow the normal approach of

---

[6] In *Wells*, the Tenth Circuit summarized what little guidance the Supreme Court had by then provided concerning the government speech doctrine. *Wells*, 257 F.3d at 1140. Notably, the Court never mentions *Mergens*, *Pinette*, or *Santa Fe Indep. Sch. Dist.*, the leading cases regarding government speech in the Establishment Clause context.

[7] This is not to deny that there has been cross-pollination between cases, such as *Wells*, covering the government speech doctrine and cases involving the public forum doctrine. In *Am. Atheists, Inc. v. Davenport*, 637 F.3d 1095 (10th Cir. 2010), the Tenth Circuit applied the "rule" from *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009), a case involving the government speech doctrine, to resolve the issue of whether memorial crosses on public property were government speech subject to Establishment Clause scrutiny. *Davenport*, 637 F.3d at 1114. The Tenth Circuit's extension of *Pleasant Grove* is logical. If permanent monuments on public property "typically represent government speech," *Pleasant Grove*, 555 U.S. at 470, which is not regulated by the Free Speech Clause, it naturally follows that such monuments are government speech under the Establishment Clause. Otherwise, the Court might find itself in the odd position of having created a category of speech that is neither private speech regulated by the Free Speech Clause nor government speech regulated by the Establishment Clause. This is unthinkable; it is axiomatic that speech must belong to someone. However, the reverse proposition, which is championed by Defendant, is not as certain; just because a display is private speech regulated by the Free Speech Clause does not mean it may not also be government speech regulated by the Establishment Clause. Everyday experience teaches that speech can be shared or hybrid. *See Santa Fe Indep. Sch. Dist.*, 530 U.S. at 303 n. 13 (acknowledging that the government's operation of a public forum for private speakers may violate the Establishment Clause); *ACLU v. Tata*, 742 F.3d 563, 569 (4th Cir. 2014) (recognizing that speech may be "neither purely government speech nor

applying the relevant Establishment Clause case law, including *Am. Atheists, Inc. v. Davenport*, 637 F.3d 1095 (10th Cir. 2010), to the case at hand.

Taken together, these cases strongly suggest that the Bloomfield Ten Commandments monument is government speech. First, "permanent monuments erected on public land" are best considered "government speech – the scope and content of which is restrained, inter alia, by the Establishment Clause." *Id.* at 1114 (holding that twelve-foot high privately-funded and privately-owned memorial crosses placed on public land in honor of fallen Utah Highway Patrol troopers were government speech subject to Establishment Clause review). Defendant points out that this is simply a rule-of-thumb; it is conceivable that a permanent monument, such as a gravestone, could contain purely private speech. However, Defendant does not identify good reason for deviating from the norm. Like the memorial crosses in *Davenport*, the Bloomfield Ten Commandments monument falls "squarely within the rule" governing permanent monuments on public land; it is a substantially sized edifice that is meant to be displayed on public property for a period of years. *See id.* at 1111, 1114.

Defendant's attempts to distinguish *Davenport* are unpersuasive. Defendant suggests that the Ten Commandments monument is not really permanent because Bloomfield's revised forum policy, which was adopted after the Ten Commandments monument was in place, requires its donors to either remove the monument after ten years or seek approval to have it remain on the City Hall Lawn. In *Davenport*, the Tenth Circuit refuted a similar argument; it explained that the memorial crosses challenged in that case were "permanent enough," despite the state's

---

purely private speech, but a mixture of the two"). At any rate, "[t]he interaction between the 'government speech doctrine' and Establishment Clause principles has not . . . begun to be worked out." *Pleasant Grove*, 555 U.S. at 486 (Souter, J., concurring), and it is not obvious that the four-factor test from *Wells* can or should be transplanted wholesale into Establishment Clause jurisprudence.

unqualified right to remove them, because the state had not, in fact, eliminated any of the memorials since the state started allowing construction of the crosses more than ten years before. *Id.* at 1116. Because the City of Bloomfield has authorized the placement of the Ten Commandments monument for a period of ten years and has the ability to renew this authorization, the monument is certainly permanent within the practical (and legal) sense of the word.

Similarly, the disclaimers accompanying the Ten Commandments monument – one stating "any message hereon is of the donors and not the City of Bloomfield" and the other clarifying that the information on the Ten Commandments monument does not "necessarily reflect the opinions of the City" – do not overshadow Defendant's decision to allow the monument to stand on public property. *See id.* at 1115 (the state's "attempt to distance itself from the message conveyed by these memorial crosses, by stating that it neither 'approves or disapproves' them, falls flat . . ."); *see also Books v. Elkhart County*, 401 F.3d 857, 867 (7th Cir. 2005) (because the seat of government is "plainly under government ownership and control," every religious display on or near this location "is marked implicitly with government approval."). Contrary to Defendant's characterization, the Tenth Circuit did not "downplay" the disclaimer in *Davenport* because it was issued post-litigation. Rather, the Court of Appeals proclaimed that the decision to place a permanent monument on public property is a "dramatic form of adoption," which overpowers the effect of a lukewarm disclaimer. *Davenport*, 637 F.3d at 1115. The same can be said in this case.

This leaves the written forum policy, the only factor that truly distinguishes this case from *Davenport*. Defendant contends that existence of the forum policy is dispositive because it communicates the City's purpose to "open its property for private parties to express many

different historical viewpoints" and the Court must defer to this intent. DEFENDANT'S POST-TRIAL BRIEF (Doc. No. 125 at 14). In so arguing, Defendant ignores Supreme Court precedent clearly indicating that not every government-created forum is spared Establishment Clause review.[8] *See Santa Fe Indep. Sch. Dist.*, 530 U.S. at 303 n. 13. An individual's contribution to a government-created forum is private, not government speech only if the forum is open and accessible to all on equal terms. *See Pinette*, 515 U.S. at 770 (1995) (plurality opinion) ("Religious expression cannot violate the Establishment Clause where it (1) is purely private and (2) occurs in a traditional or designated public forum, publicly announced and open to all on equal terms.").

The circumstances surrounding the conception and eventual erection of the Ten Commandments monument do not satisfy the Supreme Court's criteria. As an initial matter, Defendant first approved the Ten Commandments monument prior to the adoption of any forum policy. In other words, the Ten Commandments monument was not originally conceived of as a contribution to a public forum. Obviously, this undercuts Defendant's argument that the monument should be considered private speech. It intimates that the City was more interested in executing Mr. Mauzy's scheme than in opening the lawn to all-comers, as it claims. A careful review of the totality of the circumstances confirms this impression; notwithstanding Defendant's representations, the City of Bloomfield has never created the type of open public forum where speech is fully disassociated from the government.

---

[8] Defendant also fails to note the similarities between the forum policy adopted by the City of Bloomfield and the forum policy adopted by Pleasant Grove City, the defendant-appellant in *Pleasant Grove*. The Pleasant Grove lawsuit arose out of Pleasant Grove City's refusal to allow a religious organization to place a stone monument containing the Seven Aphorism of SUMMUM in a city park along with other privately donated monuments, including a Ten Commandments monument. *Pleasant Grove*, 555 U.S. at 464-466. The City justified its refusal based on its policy of limiting monuments in the park to those that "either (1) directly relate[d] to the history of Pleasant Grove, or (2) were donated by groups with longstanding ties to the Pleasant Grove community." *Id.* at 465. The year following this refusal the City passed a resolution codifying this policy and further explaining the criteria for evaluating requests to place permanent monuments in the park. *Id.* Despite this policy, the Supreme Court held that the monuments in the city park spoke for the government. *Id.* at 464.

Despite its professed intent to create a designated public forum, the City has not advertised its forum policy or taken any steps to encourage members of the community, other than Mr. Mauzy, to put monuments on the City Hall Lawn. The disclaimer sign that currently stands on the City Hall Lawn announcing the existence of the forum policy was placed there by Mr. Mauzy in 2011, the same day he erected the Ten Commandments monument. This occurred after he left the City Council, and no City funds were used for the purchase or preparation of the sign. Furthermore, prior to the placement of the Ten Commandments monument, there was no public declaration informing the community about the forum policy (aside from the resolution itself). Thus, for almost four years, there was no obvious sign that Defendant had opened the City Hall Lawn as a public forum.

In addition, the City's forum policy does not afford the community access to the City Hall Lawn for indiscriminate use. Defendant retains discretion to reject monument proposals that are not "historical" and that are aesthetically displeasing.[9] Unlike the governmental entity in *Pinette*, Defendant has not cleared its property for a broad range of views. Defendant retains ultimate control over the layout and appearance of the City Hall Lawn as well as control over the nature of the discourse occurring on the lawn: only those who want to convey a message relating to the history of the City's law and government are welcome. Defendant has not transformed the City Hall Lawn into an open public forum; it has merely provided "selective access" to the lawn. *See Santa Fe Indep. Sch. Dist.*, 530 U.S. at 303.

---

[9] The Bloomfield forum policy states: "in no event shall the City refuse to allow the placement of an item because of the view point of any message communicated by the item." Based on this language, Defendant argues that "if Plaintiffs wanted to display a historical monument about wiccans, Bloomfield could not legally reject it because of its viewpoint." DEFENDANT'S POST-TRIAL BRIEF (Doc. No. 125 at 10). The Court fails to see the practical significance of this prohibition. If Plaintiffs wanted to erect a monument about wiccans, Defendant could reject the proposal because of its negative effect on the limited remaining open space on the lawn, or because the monument was visually unappealing, or because the monument did not "relate to the history and heritage of the City's law and government." The point is that the City exercises a large degree of editorial control over what monuments are placed on the City Hall Lawn.

Finally, Mr. Mauzy, the only citizen to erect or propose a monument under the Bloomfield forum policy, presented the City Council with a comprehensive plan for the City Hall Lawn, which the City has step-by-step approved. With one exception, the space reserved for a monument in the southwest corner, this comprehensive plan accurately portrays the City Hall Lawn as it now appears. Because the City Hall Lawn embodies the fulfillment of Mr. Mauzy's plan, the City has, in effect, created not a public forum for all citizens, but a platform for Mr. Mauzy alone. *See Pinette*, 515 U.S. at 777 (O'Connor, J., concurring in part and in the judgment) ("a private . . . group may so dominate a public forum that a formal policy of equal access is transformed into a demonstration of approval."). Given this outcome, the City cannot realistically extricate itself from its continuous approval of Mr. Mauzy's personal vision. Under the facts of this case, the Court is more than comfortable saying that Defendant is sufficiently connected with the Ten Commandments monument that it must be analyzed as government speech subject to the strictures of the Establishment Clause.

**IV.     Establishment Clause Analysis**

      **A.  Lemon Test**

The First Amendment begins: "Congress shall make no law respecting an establishment of religion . . ." U.S. Const. amend. I. This prohibition, eponymously called the Establishment Clause, applies to the States and their political subdivisions under the Fourteenth Amendment. *Davenport*, 637 F.3d at 1116. As interpreted by the Supreme Court, it embodies a principle of government neutrality: "the government may not favor one religion over another, or religion over irreligion, religious choice being the prerogative of individuals . . ." *McCreary County v. ACLU*, 545 U.S. 844, 875 (2005); *see also Galloway*, 134 S. Ct. at 1822 ("Government may not mandate a civic religion that stifles any but the most generic reference to the sacred any more than it may

prescribe a religious orthodoxy."). Conduct that violates this principle by communicating a message of religious endorsement or disapproval impinges on the "integrity of individual conscience in religious matters," fans the flames of religious conflict, and tells those who disagree that they are outsiders. *McCreary*, 545 U.S. at 860, 876.

Of course, as the Supreme Court has recognized, "an appeal to neutrality alone cannot possibly lay every issue to rest, or tell us what issues on the margins are substantial enough for constitutional significance." *McCreary*, 545 U.S. at 876; *see also Van Orden*, 545 U.S. at 686 (Breyer, J., concurring) ("[T]he [Supreme] Court has found no single mechanical formula that can accurately draw the constitutional line in every case."). As a result, the Supreme Court and all those bound to follow in its wake have "struggled mightily" to formulate clear guidelines about actions that are and are not permissible under the Establishment Clause. *Davenport*, 637 F.3d at 1117. In the Tenth Circuit, courts continue to apply the three-part test set out in *Lemon v. Kurtzman*, 403 U.S. 602 (1971) as modified by Justice O'Connor's endorsement gloss. *See Green*, 568 F.3d at 796. According to this test, the government violates the Establishment Clause if it impermissibly endorses religion by having either the primary purpose or effect of "conveying a message that religion or a particular religious belief is favored or preferred" or if it fosters an excessive government entanglement with religion. *Id.* (quoting *Bauchman v. West High Sch.*, 132 F.3d 542 (10th Cir. 1997)).

The endorsement analysis is objective; it requires the Court to assume the mindset of a reasonable observer who is aware of the purpose, context, and history of the symbol. *Id.* at 799. Like the "reasonably prudent person" of tort law, this observer's knowledge is not limited to "the information gleaned simply from viewing the challenged display." *Id.* (quoting *Weinbaum*, 541 F.3d at 1031). The objective observer possesses a "broad sense of community awareness." *Id.* at

800. Hence, in performing the role of this observer, the Court is thrust into a realm of pretend and make-believe, guided only by confusing jurisprudence and its own imagination.[10]

The fictitious objective observer of Establishment Clause jurisprudence is not omniscient or hyper-vigilant. *Id.* The Tenth Circuit has made it clear that the objective observer is not overly sensitive to any and all religious iconography. For example, while a reasonable objective observer would certainly know that the Ten Commandments constitute an unmistakably religious document "dealing with religious obligations," *McCreary*, 545 U.S. at 869, this same observer would also acknowledge that "in certain contexts" the Ten Commandments can convey a secular message about the "proper standards of social conduct" or about "the historic relation between those standards and the law." *Green*, 568 F.3d at 798-799 (quoting *Van Orden*, 545 U.S. at 701 (Breyer, J., concurring)). To summarize, the objective observer, *i.e.* the Court, must be attentive to the facts of each case. "A challenged government action that might pass constitutional muster in some settings might be deemed constitutionally suspect . . . in other contexts." *Id.* at 800 (internal citation omitted).

**B.  Application[11]**

### 1. The Monument's Religious Effect

Because the endorsement analysis is "fact-intensive," *id.*, guidance from other courts can ultimately only aid and inform the Court's reasoning, not dictate one unquestionable outcome.

---

[10] Almost fourscore years ago, childhood was less complicated. There were no distractions of television, iPhones, laptops, iPads, cellphones, video game consoles, computers, and the like. The regimentation of Little League Baseball, Young America Football, youth soccer and other team sports programs did not impinge on a youngster's free time. Imagination influenced children's activities and a favorite game was "Play Like." Having to play like the reasonable, objective observer of legal construct brings back pleasant memories of that fun pastime of years ago.

[11] In the section of its brief addressing the effect prong, Defendant makes two analytically distinct arguments: (1) the display of the Ten Commandments monument, along with other monuments, has a primary secular effect of commemorating Bloomfield's heritage, and (2) a reasonable observer would attribute the monuments to private parties. Both of these issues, the message conveyed by the monument and Defendant's endorsement of this message, are integral and interrelated parts of the endorsement analysis. The Court will address each argument below, always keeping in mind the ultimate issue: did Defendant, through its conduct, impart a message of religious endorsement?

Nonetheless, like all cases, this case must be decided through the sound exercise of legal judgment, and it is incumbent upon the Court to garner what instruction it can from precedent. The Tenth Circuit's most recent, useful, and full-fledged analysis of a Ten Commandments display is set forth in *Green*, a case factually similar to the case at hand. In *Green*, the plaintiff challenged the placement of a Ten Commandments monument on the lawn of the Haskell County courthouse in Stigler, Oklahoma. *Id.* at 787-88. Although it stood among various other monuments, including monuments honoring those killed in Vietnam, Korea, and World Wars I and II, and although it was privately-funded, the Tenth Circuit found that a reasonable observer would view the monument as having the impermissible primary effect of endorsing religion. *Id.* at 788-90.

The following facts influenced the Tenth Circuit's decision: (1) the monument's sponsor had a religious motivation (it was built with funds raised through local religious groups), *id.* at 790; (2) the Board of County Commissioners knew of this motivation, but "swiftly approved its erection" and did not hesitate to defend the monument from legal challenge, *id.* at 800; (3) at a dedication ceremony for the monument, which was planned by nearby residents, local pastors prayed and gave remarks, *id.* at 791; (4) after the monument garnered criticism, members of the Board of County Commissioners supported the monument by giving public statements, some of which evinced their intent to promote religion (when speaking of his support for the Ten Commandments monument, one Commissioner said "God died for me and you, and I'm going to stand up for him"), *id.* at 801-802; and finally (5) the Board of County Commissioners never clarified its purpose in defending the monument, *id.* at 801.

Obviously, Defendant's conduct and the circumstances surrounding the placement of the Ten Commandments monument on the Bloomfield City Hall Lawn vary from the behavior of the

Haskell Board of County Commissioners and the situation in *Green*. The facts are not an exact match; for example, there is no evidence that any Bloomfield City Councilor or City official posed for photographs with the Ten Commandments monument. Likewise, Bloomfield City officials have been less fervent in their support of the monument. Aside from statements made during the course of this litigation, Mr. Mauzy appears to be the only City official (or former City official) to have made any public comments concerning the purpose of the monument. Finally, unlike in *Green*, the Ten Commandments monument on the Bloomfield City Hall Lawn was not erected until after the Bloomfield City Council passed a resolution governing the placement of monuments on the lawn.

Nonetheless, the Court concludes that *Green* and this case fall from the same mold. In this case, an objective observer, expansively aware of community activities, would know that the City of Bloomfield originally approved putting the Ten Commandments monument on city property prior to the adoption of any written policy governing the placement of monuments on the City Hall Lawn. While Mr. Mauzy proposed that this monument be the "start of a series," he did not initially seek permission to build any other monument; and, the City Council did not approve the installation of any other monument in April 2007 when it first approved the Ten Commandments monument. At that time, the City had complete discretion to accept or reject Mr. Mauzy's request. It could have waited to approve the Ten Commandments monument until after the forum policy was enacted, but it did not.

Defendant asks the Court to disregard these facts. *See* DEFENDANT'S POST-TRIAL BRIEF (Doc. No. 125 at 21) ("[B]ecause the monuments actually arose under Bloomfield's forum policy, this policy, its legislative history, and Bloomfield's post-policy actions provide the relevant data set for analysis."). But the Court cannot close its eyes to the context and history in

which the Ten Commandments monument arose; "reasonable observers have reasonable memories." *McCreary*, 545 U.S. at 866. Here, it is clear that the City's June 2011 approval of the Ten Commandments monument under the forum policy occurred in the shadow of its April 2007 decision to approve the monument. Notably, the first forum policy was passed, shortly after the 2007 vote approving the Ten Commandments monument, at the behest of Mr. Mauzy, the monument's promoter. Furthermore, when Mr. Mauzy first returned to the City Council in 2011 to discuss the Ten Commandments monument, he did not immediately request permission to proceed with construction of the monument under the forum policy. His first step was to update the Council members about his progress in preparing the Ten Commandments monument. Then, he asked the City Clerk if he could formally present the Ten Commandments monument at the next meeting. Upon hearing this request, the City Mayor and City Manager put Mr. Mauzy's presentation of the Ten Commandments monument on the June 13, 2011 consent agenda to be voted on in block format with other routine, procedural items.

Clearly, at each step in the process, both Mr. Mauzy and various City officials assumed that the members of the City Council were aware of the City Council's 2007 approbation of Mr. Mauzy's plan to erect a Ten Commandments monument. This would certainly color a reasonable observer's understanding of the City's purpose in adopting the forum policy and approving the placement of the Ten Commandments monument. As previously stated, the order of events strongly suggests that the City's initial approval of the Ten Commandments monument prompted its decision to adopt a forum policy. Indeed, Defendant describes the forum policy as "clarifying its secular purpose." DEFENDANT'S POST-TRIAL BRIEF (Doc. No. 125 at 25-26). Similarly, the City Council's 2011 decision reaffirming Mr. Mauzy's right to construct the Ten Commandments monument stemmed directly from its 2007 decision to approve the monument.

Seen through the eyes of a reasonable observer, Defendant first approved the construction of a Ten Commandments monument in isolation, and then continued to stand by this decision despite the resulting controversy and the religious undercurrents surrounding the fundraising efforts for the monument.

Like in *Green*, a reasonable observer would also know about the objections lodged against the Ten Commandments monument and the City's willingness to go forward with the project despite the possibility that there would be adverse legal consequences. This is not a case where a history of community acceptance of the monument indicates that a reasonable observer would consider "'the religious aspect of the tablets' message as part of . . . a broader moral and historical message reflective of a cultural heritage." *Van Orden*, 545 U.S. at 703 (Breyer, J., concurring). The City's defense of the monument cannot be justified from a "preservationist perspective." *See Glassroth v. Moore*, 335 F.3d 1282, 1300 (11th Cir. 2003) ("[A] new display of the Ten Commandments is much more likely to be perceived as an endorsement of religion by the government than one in which there is a legitimate preservationist perspective.") (internal citation omitted).

Finally, and most significantly, Mr. Mauzy, the monument's sponsor, starting when he was a Bloomfield City Councilor, has acted in such a way that a reasonable person would conclude his primary reason for erecting and maintaining the Ten Commandments monument is religious. *See McCreary*, 545 U.S. at 862 (considering the public comments of the sponsor of a Ten Commandments display). From the beginning, Mr. Mauzy signaled to the public the connection in his mind between the Ten Commandments monument project and the Christian community by fundraising through local churches exclusively, rather than through a variety of local civic organizations. Mr. Mauzy further underscored the religious nature of the Ten

Commandments monument through his planning and organization of a dedication ceremony, which had numerous religious components.

At this ceremony, Mr. Mauzy's opening remarks were immediately followed by a prayer. The singing of the Star Spangled Banner and the recitation of the Pledge of Allegiance followed. Then, members of a local Veterans of Foreign Wars (VFW) chapter conducted a detailed flag folding ceremony. The VFW speaker began by informing the crowd that the flag "represents all the ideals of the people of the United States." He subsequently narrated the flag folding ceremony, describing what each fold symbolized. Many symbols were religious in nature. For example, the second fold symbolized "our belief in eternal life;" the third, "our weaker nature" compared to God; the eighth, "the one who entered the valley of the shadow of death;" the twelfth, "an emblem of eternity" glorifying "in the Christian eyes God the Father, the Son, and the Holy Spirit." Afterwards, Mr. Mauzy spoke again explaining that the purpose of the dedication ceremony was to "acknowledge and to reaffirm the foundational role of the Ten Commandments in our nation, our Constitution, and our lives." Consistent with this statement, Mr. Mauzy's comments emphasized his belief in the value of Christian precepts to American people today and celebrated the vitality of the Christian religion. *See* Stipulated Exhibit XXV ("Some would believe that this monument is a new thing. They have been so busy trying to remove God from every aspect of our lives that they have overlooked our history. Well, I've got news for you, it's been here all along. . . You and I are average citizens who believe just like most of our fellow Americans. We want the government to leave us alone and to keep our – their hands off our money, our religion, our Ten Commandments, our guns, our private property, and our lives . . . God and his Ten Commandments continue to protect us from our evil. I would urge you to talk with someone every day who does not understand our nation's history and our great

heritage. Tell them why the United States is still a good and prosperous nation. It still remains that brightly lit city on the hill. . . . May God bless and protect this monument. May He continue to bless this city and this state and may God bless the United States of America.").

While Mr. Mauzy testified that he erected the Ten Commandments monument for "historical" instead of "religious" purposes, Mr. Mauzy's religious statements have thoroughly eclipsed his putative "historical" message. There is a fine line between (1) acknowledging the secular significance of the role the Ten Commandments have played in this country's heritage and (2) making a religiously-charged statement about what the values of a city, state, or locale ought to be. The first is permissible under the Establishment Clause while the second is not. *See Galloway*, 134 S. Ct. at 1822 (the Establishment Clause prohibits the government from dictating what is orthodox); *Weinbaum*, 541 F.3d at 1034 ("The putative secular explanation of the Christian cross was that it reflected the Christian heritage of the area but that, of course, is not a secular explanation at all."). To the extent that Mr. Mauzy's message can be attributed to the City of Bloomfield, it is clear that he – and therefore the Defendant City – crossed this line.[12]

This is not to say that there are no factors tempering the religious nature of the Ten Commandments monument. The Ten Commandments monument currently stands as part of a coherent display with three other historical monuments: a Declaration of Independence monument, a Gettysburg Address monument, and a Bill of Rights monument. This weighs against a finding that the Ten Commandments monument conveys a message that a particular religious belief is favored or preferred. However, the Court cannot say that this is enough to tip the balance in favor of Defendant. The Ten Commandments monument directly abuts the sidewalk running in front of the Bloomfield Municipal Complex. Depending on the viewer's

---

[12] At trial Mr. Mauzy testified that he views this lawsuit as an attack on his religious freedom, thereby reaffirming the impression that the Ten Commandments monument was meant to communicate a religious message.

position and perspective, it can appear to be the most prominent monument on the lawn. It is not hidden or obscured by the other monuments and it is clearly visible to an observer standing directly in front of the City Hall Lawn.

Furthermore, unlike in *Van Orden*, the Bloomfield Ten Commandments granite monument was (1) recently erected, (2) in face of controversy, (3) originally in isolation, and (4) was only later joined by other monuments. The Court is not aware of any recent court of appeals decision upholding a Ten Commandments display as being consistent with the Establishment Clause under these circumstances. The post-2005 appellate decisions sanctioning Ten Commandments displays address factual situations markedly different from the picture in this case. *See*, *e.g.*, *Books v. Elkhart*, 401 F.3d 857, 868 (7th Cir. 2005) (holding that the inclusion of the Ten Commandments in a multifaceted historical exhibit of texts, which were all donated at the same time, did not violate the Establishment Clause because the Ten Commandments monument was placed in "a simple rectangular frame identical to the other documents and symbols in the exhibit, not on a tablet-shaped monument whose very format . . . conveyed a religious message") (internal citation omitted); *ACLU of Kentucky v. Mercer County*, 432 F.3d 624, 638 (6th Cir. 2005) (a county's display of a Ten Commandments document along with other documents relevant to American History did not impermissibly endorse religion because the county did not attempt "to erect the monument in isolation . . . before posting the . . . display"); *ACLU v. Grayson County*, 591 F.3d 837, 848 (6th Cir. 2010) (same); *Card v. City of Everett*, 520 F.3d 1009, 1021 (9th Cir. 2008) (refusing to order the removal of a Ten Commandments monument donated in 1959 because the Establishment Clause does not require the eradication of "longstanding depictions of the Ten Commandments").

Defendant's strongest argument is that the display of the Ten Commandments monument does not violate the Establishment Clause, even if the message conveyed by the monument is religious, because a knowledgeable, reasonable observer would not attribute this message to the City, *i.e.* the City has not endorsed the religious message of Mr. Mauzy, the monument's sponsor. Defendant's basis for this argument is the existence of the forum policy, which the Defendant characterizes as "clarifying" the City's secular purpose in allowing the display of the monument. DEFENDANT'S POST-TRIAL BRIEF (Doc. No. 125 at 25-26). According to Defendant, the City has neutrally enforced this policy and cannot be "blamed" for the Ten Commandments monument originally being placed in isolation or for the statements made at the dedication ceremony by private parties. *Id.* at 23. The Court agrees that Defendant has a forceful contention. However, after a careful review of the facts, the Court believes that the City's unwavering support for Mr. Mauzy's project, including the City's authorization of the original display of the stand-alone Ten Commandments monument, is not neutral, but conveys a message that the City endorses Mr. Mauzy's message about the religious significance of the Ten Commandments to this country. *See County of Allegheny v. ACLU*, 492 U.S. 573, 621 (1989) (O'Connor, J., concurring) (acknowledging that that a city may run afoul of the Establishment Clause by endorsing the "proselytizing message" of a private donor of a religiously-themed display).

### 2. Endorsement of Mr. Mauzy's Message

Accepting a privately donated monument and placing it on city property is expressive conduct in its own right. When the government displays a privately funded monument, it does not necessarily adopt the same message intended by the monument's donor or creator. *Pleasant Grove*, 129 S. Ct. at 1136 ("[T]he thoughts or sentiments expressed by a government entity that

accepts and displays [a privately donated] object may be quite different from those of either its creator or its donor."); *O'Connor*, 416 F.3d at 1231 (the government may display religiously-themed art as long as it does not promote or give its stamp of approval to the religious message). Thus, the statements of a monument's sponsor, while clearly relevant, are not dispositive to the endorsement analysis. *Grayson County*, 591 F.3d at 855 n. 10 (recognizing that the religious purpose of a private sponsor can be relevant to the inquiry under the effect prong of the endorsement analysis, but finding that there is no Establishment Clause violation in the absence of evidence indicating that the government has approved of this purpose); *Green*, 568 F.3d at 801 n. 10 ("Under the effect prong, although the area of concern is . . . the government actor's conduct--that is, its effect--the analysis must undertake a significant inquiry into the surrounding circumstances of which the reasonable observer would have been aware," including statements of a monument's donor).

Here exits evidence from which a reasonable observer could conclude that Defendant has endorsed Mr. Mauzy's religious purpose. First, Mr. Mauzy was a member of the City Council when he first proposed the Ten Commandments monument and the City Council approved it. Accordingly, his 2011 statements shed light on the City Council's motivation behind approving the monument in 2007. This is not a case where there is no evidence that a "government actor had any religiously motivated reason for displaying" the Ten Commandments. *See O'Connor*, 416 F.3d at 1226 ("[W]hen there is no evidence of improper motive, campus beautification is a permissible justification for displaying a [religiously-themed] work of art."). In addition to giving insight into his own motivations for approving the Ten Commandments monument in 2007, Mr. Mauzy's 2011 statements at the dedication ceremony heavily contributed to the impression that the City endorsed his religious message.

The July 4, 2011 dedication ceremony occurred on the front lawn of the Bloomfield City Hall. Although no City officials spoke at the ceremony or played any role in determining the content of the ceremony, the City took no steps to distance itself from the ceremony, which transpired on City property in close proximity to the seat of City government, a location implicitly associated with government approval. Given this location, a reasonable observer could have concluded that the words of Mr. Mauzy, a former City Councilor and the sponsor of the monument, carried the government's imprimatur. Aside from reading the disclaimer printed on the Ten Commandments monument during the ceremony, Mr. Mauzy did nothing to dispel this impression. Defendant's insistence that no one would associate the City of Bloomfield with this event, because it was organized by private parties, is unreasonable. The government often sanctions or supports the speech of private individuals. Because the City of Bloomfield did not have a history of allowing purely private events on the City Hall Lawn – the Bloomfield City Manager could not remember ever being asked about holding a private event on the City Hall Lawn before Mr. Mauzy planned the Ten Commandments dedication ceremony – it is natural that an observer would assume that the City had approved of the dedication ceremony. In fact, the City Manager testified that he granted Mr. Mauzy's request to hold a Ten Commandments dedication ceremony because he thought it was "a good thing."[13]

---

[13] Defendant argues that the City allowed Mr. Mauzy to hold a dedication ceremony "under Bloomfield's neutral policies." DEFENDANT'S POST-TRIAL BRIEF (Doc. No. 125 at 23). The trial evidence does not support such a finding. To the contrary, the facts show that Bloomfield does not have a formal policy concerning events on the City Hall Lawn; the Bloomfield forum policy does not open the lawn for dedication ceremonies or provide guidelines for the content of these ceremonies. While the City has permitted Mr. Mauzy to hold dedication ceremonies on the City Hall Lawn for each of the monuments he has erected, the Court cannot infer that this is part of a neutral albeit informal policy allowing a variety of private citizens access to the City Hall Lawn. Defendant points out that the parties stipulated that "[i]t is Bloomfield's practice to let anyone use the City Hall lawn for events so long as those events are safe." But this is not consistent with the trial testimony. The City Manager testified that during his tenure no one besides Mr. Mauzy has ever held an event or asked to hold an event on the City Hall Lawn. In approving Mr. Mauzy's request to hold a dedication ceremony for the Ten Commandments monument, the City Manager did not make even the most basic inquiries about the content of the proposed ceremony. (At trial, he testified that he did not recall seeing an agenda or asking who would be speaking). It defies belief that the City would follow the same procedure in approving the request of anyone who wanted to hold an event on the City Hall Lawn. It seems obvious

The Court acknowledges that the forum policy and the accompanying disclaimers militate against a finding that the City endorsed the message of Mr. Mauzy, the private donor of the Ten Commandments monument. Normally, a disclaimer can work to distance a governmental entity from the religious aspects of a piece of art or other display on governmental property. *See Green*, 568 F.3d at 808. Yet, under the unique facts of this case, the close ties the City has fostered with Mr. Mauzy overshadow the effect of these disclaimers. The City has regularly and openly treated Mr. Mauzy as an agent in regard to the project of managing the placement of monuments on the City Hall Lawn. When a tree located on the City Hall Lawn died, Mr. Mauzy removed it with the permission of the City Manager. Similarly, it was Mr. Mauzy who purchased and placed the disclaimer sign on the City Hall Lawn, once again with the permission of the City Manager. Mr. Mauzy submitted both Resolution #2007-12 and Resolution # 2011-15, the original and updated forum policies to the City for consideration.[14] To top it off, Mr. Mauzy provided the City Council with a comprehensive plan for the layout of the City Hall Lawn.

The City's fidelity to this plan is particularly telling. Whatever the City's intention was in adopting the forum policy, it has not actually opened the City Hall Lawn to "many different historical viewpoints." DEFENDANT'S POST-TRIAL BRIEF (Doc. No. 125 at 14). Rather, it has opened the lawn to Mr. Mauzy and to Mr. Mauzy alone. For this reason, the coherence of the monument display actually cuts against Defendant's argument that the City has not conveyed "a

---

that the City Manager approved Mr. Mauzy's request, at least in part, because he trusted and respected Mr. Mauzy. In other words, Bloomfield does not appear to have had a practice of, let alone a neutral procedure for, opening the City Hall Lawn to private parties.

[14] Mr. Mauzy is well aware of his special relationship with the City of Bloomfield. He testified that he was not surprised when the City Council adopted the amended forum policy he submitted to the City Manager. Additionally, Mr. Mauzy has ordered each monument prior to receiving formal approval to place the monument on the City Hall Lawn, because he felt confident that the City Council would approve his requests. Finally, Mr. Mauzy has, at times, created the impression that he speaks for the City or the community in supporting the Ten Commandments monument. In 2007, while he was still a member of the Bloomfield City Council, Mr. Mauzy told a reporter from the Farmington Daily Times: "We want everyone to be able to be a part of it. We've set up a fund through Jacob's Well for people to make donations privately or through their church." Similarly, at a 2007 City Council meeting, he told someone who opposed the placement of the Ten Commandments monument that "our nation was founded on these principles."

message that religion or a particular religious belief is favored or preferred." *Green*, 568 F.3d at 796 (quoting *Bauchman*, 132 F.3d at 551). The coherence of the display suggests that the display as a whole and each monument in it conveys a message on behalf of the City. It undermines the notion that the City has opened the lawn to a variety of speakers, without endorsing the message of these diverse and assorted private citizens. In light of all these facts, the Court finds that the City Hall Lawn is not akin to the museum-like setting in *O'Connor. See O'Connor*, 416 F.3d at 1228 ("Viewed in the context of these other statues, Holier Than Thou was part of a typical museum setting that, though not neutralizing the religious content of a religious work of art, negates any message of endorsement of that content.") (internal citations omitted). Despite the forum policy and the disclaimers, a reasonable observer would conclude that the primary effect of the City's conduct has been to impermissibly endorse Mr. Mauzy's message about the religious significance of the Ten Commandments to the Bloomfield community.[15]

## V.    Conclusion

As noted in the proem, the Court considers this to be a very close case. The result could differ with a slight change in the facts. For example, had the Ten Commandments monument been established last in the series of monuments, after placement of the Declaration of Independence, Gettysburg Address, and Bill of Rights monuments, the First Amendment may not have been offended. Had the Ten Commandments monument been arranged at the rear of the north lawn near the municipal building complex, with the other three monuments (consisting of six tablets) in front of it, the Ten Commandments monument may have passed muster. Had the Ten Commandments monument been installed without a dedication event or with a ceremony absent religious overtones, the ultimate conclusion may have differed. Had the City of

---

[15] Because the Court concludes that the display of the Ten Commandments monument has the impermissible effect of endorsing religion, it need not and will not address whether Defendant had a secular purpose for displaying the monument.

Bloomfield adopted the amended policy permitting monuments first, with language clearly allowing only temporary residence of a monument, the result might have changed. Any variation in the many factors in this proceeding could favor the Defendant instead of the Plaintiffs. Nevertheless, the Court decides that the legal precedent, by which it is constrained, mandates a ruling that the Bloomfield Ten Commandments monument violates the Establishment Clause of the First Amendment.

Based on the above analysis, the Court makes the following conclusions of law:

a. Plaintiffs have Article III standing because they have regular, direct, and unwelcome contact with the Ten Commandments monument and therefore have suffered an "injury-in-fact," which was caused by Defendant's conduct and is likely to be redressed by a favorable decision.

b. The Ten Commandments monument is government speech regulated by the Establishment Clause because the Ten Commandments monument is a permanent object located on government property and it is not part of a designated public forum open to all on equal terms.

c. In view of the circumstances surrounding the context, history, and purpose of the Ten Commandments monument, it is clear that the City of Bloomfield has violated the Establishment Clause because its conduct in authorizing the continued display of the monument on City property has had the primary or principal effect of endorsing religion.

IT IS ORDERED THAT Defendant, the City of Bloomfield, New Mexico, a municipal corporation, must remove the Ten Commandments monument from its City Hall Lawn by September 10, 2014.


_____
SENIOR UNITED STATES DISTRICT JUDGE